STATE of Utah, Plaintiff and Appellee,

v.

Rex NEWMAN, Defendant and Appellant.

No. 950208–CA.

Court of Appeals of Utah.

Nov. 29, 1996.

Earl Xaiz and Hakeem Ishola, Salt Lake City, for Defendant and Appellant.

Jan Graham and James H. Beadles, Salt Lake City, for Plaintiff and Appellee.

Before BENCH, GREENWOOD and WILKINS, JJ.

GREENWOOD, Judge:

Defendant, Rex Newman, appeals a jury verdict convicting him of aggravated assault, a third degree felony, in violation of Utah Code Ann. § 76–5–103 (1995), and of criminal trespass, a class C misdemeanor, in violation of Utah Code Ann. § 76–6–206 (1995). We affirm.

## BACKGROUND [1]

In the summer of 1993, Daniel Wolfe began constructing a home in Pleasant Grove, Utah, on an empty lot bordering property owned by Fred Newman. Concerned about the construction's effect on his property,

---

1. We recite the facts in a light most favorable to the jury verdict. *See, e.g., State v. Beltran–Felix,* 922 P.2d 30, 31 n. 2 (Utah App.1996).

Fred built a chicken-wire fence on the border between his property and Wolfe's lot. On July 30, 1993, Wolfe's subcontractors began excavating for the home's foundation. When Wolfe visited his lot that evening, he noticed the subcontractors had inadvertently piled a large mound of dirt against Fred's fence. The dirt caused the fence to bulge in and some of the dirt had spilled through the fence onto Fred's property. Wolfe began to move the dirt away from the fence with a trackhoe.

Fred then appeared on Wolfe's property and accused Wolfe of destroying his fence and demanded that Wolfe stop work. Wolfe apologized and attempted to explain that he was trying to move the dirt away from the fence. As Wolfe continued to assure Fred that he would clean up the fence, Fred left. About ten minutes later, Fred returned with his brother Don Newman, and both Fred and Don began yelling taunts and threats at Wolfe. Soon thereafter, Fred's other brother, Rex Newman, the defendant in this appeal, arrived and joined his brothers in yelling at Wolfe and demanded that Wolfe move the dirt with a shovel, instead of with the trackhoe. To appease the brothers, Wolfe agreed to use a shovel. As Wolfe walked toward the street to retrieve a shovel from his truck, however, the brothers blocked his path and continued shouting.

The confrontation escalated until the three brothers closely surrounded Wolfe. At some point, defendant yelled, "grab him," pulled Wolfe toward him by the shirt, and punched him squarely in the face. Wolfe crumpled to the ground and nearly lost consciousness, but was able to grab defendant's knees and pull him to the ground. Wolfe buried his head into defendant's stomach, enduring continued blows to the back and front of his head and to his rib cage. After a few minutes, a police officer arrived on the scene and broke up the fight.

Wolfe suffered injuries to his nose, requiring two separate surgeries to correct. Defendant's blow also fractured seven of Wolfe's teeth, which had to be crowned, and chipped one tooth, which had to be glued together. All three Newman brothers were charged with aggravated assault and criminal trespass. All three were represented by a single attorney, Andrew McCullough. Before trial, McCullough requested that the Newman brothers' trial be severed, but the trial court denied this motion. McCullough expressed his concern about a potential conflict of interest among his clients, and stated he would discuss this concern with his clients and perhaps Bar counsel before proceeding further.

During jury voir dire, prospective juror Tom Cryer indicated that he had been assaulted by his wife's ex-husband, whose last name was also Newman. In addition, Cryer said that the Mr. Newman who assaulted him lived in Pleasant Grove and "looks a lot like" the Newman brothers. The trial court asked Cryer if he could be impartial despite this experience. Cryer said he could and acknowledged that "the defendants can't really be responsible for the actions of someone that's related to them." Nevertheless, the trial court ultimately struck Cryer for cause.

At trial, several witnesses testified on behalf of the Newman brothers, including Don's wife and a nephew. All defense witnesses gave similar testimony about the encounter. According to the defense witnesses, defendant hit Wolfe in self-defense, and at all times, Wolfe was the aggressor. Although trial counsel indicated during his opening statement that defendant would testify, Don was the only brother to testify. After a four-day trial, all three brothers were convicted of criminal trespass. In addition, Don was convicted of simple assault, and defendant of aggravated assault.

## ISSUES

Defendant's appeal raises the following issues: (1) Did trial counsel's representation of all three Newman brothers constitute a conflict of interest which rendered counsel's representation constitutionally ineffective; and (2) did potential juror Cryer's comment, concerning a previous encounter with someone who may have been related to the Newman brothers, prejudice the entire jury panel such that trial counsel's failure to move for a mistrial or ask for other curative measures

denied defendant effective assistance of counsel?

■ Because defendant's ineffectiveness claims arise for the first time on appeal, without a prior evidentiary hearing, the claims present a question of law. *State v. Saunders,* 893 P.2d 584, 591 (Utah App.), *cert. granted,* 910 P.2d 425 (Utah 1995). However, our review is highly deferential to counsel's trial decisions to avoid second-guessing tactical considerations. *Id.*

### Conflict of Interest

■ Defendant first argues that trial counsel's motion to sever triggered the trial court's duty to ensure that counsel's representation of all three Newman brothers did not constitute a conflict of interest. The State counters that the trial court was not obliged to inquire further about a conflict where counsel informed the court he would investigate that possibility himself.

■ Normally, to prevail on a claim that trial counsel's conflict of interest resulted in constitutionally ineffective assistance of counsel, a defendant "must show that an actual conflict of interest existed which adversely affected his [or her] lawyer's performance." *State v. Webb,* 790 P.2d 65, 73 (Utah App. 1990), *denial of habeas aff'd,* 853 P.2d 898 (Utah App.), *cert. denied,* 860 P.2d 943 (Utah 1993), *denial of habeas aff'd,* 67 F.3d 312 (10th Cir.1995); *accord Cuyler v. Sullivan,* 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980). However, an actual conflict that adversely affected the lawyer's performance is presumed under "special circumstances" in which counsel puts the trial court on notice that a conflict probably exists. *Cuyler,* 446 U.S. at 346–47, 100 S.Ct. at 1717.

For example, in *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), defense counsel, representing three codefendants, moved to sever their trials and for appointment of separate counsel, on the grounds that he and the defendants themselves were concerned that their interests were conflicting. *Id.* at 478, 98 S.Ct. at 1175. The *Holloway* Court noted the following considerations:

[First, a]n "attorney representing two defendants in a criminal matter is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of trial." Second, defense attorneys have the obligation, upon discovering a conflict of interest, to advise the court at once of the problem. Finally, attorneys are officers of the court, and " 'when they address the judge solemnly upon a matter before the court, their declarations are virtually made under oath.' "

*Id.* at 485–86, 98 S.Ct. at 1179 (footnotes and citations omitted). Accordingly, the Court determined that the trial court's failure to heed counsel's repeatedly-expressed concerns constituted reversible error, irrespective of whether defendant had demonstrated any actual conflict or prejudice. *Id.* at 484–85, 98 S.Ct. at 1178–79.

■ Nevertheless, under the *Holloway* rationale, trial courts generally may rely on counsel to discover and appropriately deal with any conflicts, in cases involving multiple representation. *Cuyler,* 446 U.S. at 346–47, 100 S.Ct. at 1717. Thus, where counsel makes no objection at trial, the trial court may presume that no improper conflict due to joint representation is present. *Id.* at 348, 100 S.Ct. at 1718; *Webb,* 790 P.2d at 73. Similarly, trial courts may rely on counsel's representations that he or she has or will investigate the possibility of conflicts and notify the court if any conflict arises. *See United States v. Kidding,* 560 F.2d 1303, 1310 (7th Cir.), *cert. denied,* 434 U.S. 872, 98 S.Ct. 217, 54 L.Ed.2d 151 (1977).

In *Kidding,* defense counsel assured the court that after discussing joint representation with his clients, he felt there would be no conflict, and if any conflict should arise, he would immediately advise his clients to obtain separate counsel. *Id.* Under these facts, the reviewing court stated it was reasonable for the trial judge to infer that counsel and his clients had made an informed decision to proceed with joint representation. *Id.* The *Kidding* court therefore concluded the trial court had no obligation to delve further into the matter. *Id.*

■ Thus, where an attorney representing more than one codefendant clearly

informs the trial court of "the *probable risk of a conflict of interest*," there is a presumption that the codefendants' constitutional right to counsel is compromised. *Holloway*, 435 U.S. at 484–85, 98 S.Ct. at 1178–79 (emphasis added); *accord Cuyler*, 446 U.S. at 345–46, 100 S.Ct. at 1716–17; *Webb*, 790 P.2d at 72. In such special circumstances, if the trial court fails "either to appoint separate counsel or to take adequate steps to ascertain whether the risk was too remote to warrant separate counsel," the defendants are deprived of their constitutionally guaranteed assistance of counsel. *Holloway*, 435 U.S. at 484, 98 S.Ct. at 1178; *accord Cuyler*, 446 U.S. at 348, 100 S.Ct. at 1718; *Webb*, 790 P.2d at 72–73. Absent these special circumstances, however, a defendant can prevail on a conflict of interest ineffectiveness of counsel claim only by demonstrating an actual conflict which affected his or her attorney's performance. *Webb*, 790 P.2d at 73. A defendant who makes this showing need not demonstrate prejudice. *Id.*

In the instant case, trial counsel did not inform the trial court of a *probability* of a conflict among the Newman brothers. Although counsel filed a motion to sever the brothers' trial, such a motion would not necessarily have put the court on notice of an actual conflict. If the alleged actual conflict in this case—that trial counsel would need to emphasize the other brothers' culpability while de-emphasizing defendant's—was a real danger, the court might have expected counsel to move for appointment of separate counsel for each codefendant.

More importantly, during arguments on the motion to sever, counsel indicated that he would investigate the possibility of a conflict and would discuss the matter with his clients. Under these circumstances, the trial court

properly relied on counsel's statements and on counsel's decision to proceed with the multiple representation. *Cf. id.* at 74 ("In the absence of other facts or circumstances that should reasonably bring a conflict of interests between codefendants to the trial court's attention, we decline to hold that ... a trial judge 'knows or reasonably should know' before or at trial of a conflict suggested in an abandoned pretrial severance motion.").[2]

■ Defendant also argues that the record demonstrates an actual conflict of interest which affected his representation. To this end, defendant contends that each Newman brother had varying defenses and degrees of culpability, that trial counsel did not refer to defendant frequently enough in opening and closing statements, and that trial counsel should have called defendant to testify after earlier stating he would. We agree with the State, however, that defendant has not shown an actual conflict.

■ "In order to show an actual conflict of interest existed, a defendant must point to specific instances in the record to suggest an actual conflict or impairment of his or her interests." *Webb*, 790 P.2d at 75. However, "hypothetical or speculative conflicts will not suffice to establish a violation." *State v. Humphrey*, 793 P.2d 918, 923 (Utah App. 1990). This court has acknowledged that "a substantial disparity of evidence incriminating each defendant" may, in certain circumstances, evince an actual conflict. *Webb*, 790 P.2d at 76 (citing *Armstrong v. People*, 701 P.2d 17, 22 (Colo.1985) (en banc)).

In *Armstrong*, a husband and wife, represented by a single attorney, were charged with conspiracy to commit aggravated robbery, while the husband was separately charged with aggravated robbery, second degree kidnapping, aggravated car theft, sec-

---

**2.** The Federal Rules of Criminal Procedure require federal trial courts to take a much more active role, in cases of multiple representation, in investigating possible conflicts and in advising defendants of their rights regarding separate representation. *See* Fed.R.Crim.P. 44(c) (requiring trial courts to scrutinize any case of joint representation and to take steps necessary to ensure no conflict exists, including personally advising defendants of their right to effective, conflict-free counsel). Moreover, some jurisdictions presume prejudice in *any* case involving multiple representation, unless the trial court investigates further or obtains the codefendants' consent on the record. *See, e.g., Shongutsie v. State*, 827 P.2d 361, 367 (Wyo.1992). Nonetheless, these steps are not dictated by the United States Constitution and have not been adopted by rule or case law in Utah. Even so, to avoid claims such as defendant's, when codefendants are represented by a single attorney, Utah trial courts might consider obtaining consent to such joint representation on the record. *See also State v. Humphrey*, 793 P.2d 918, 924 n. 3 (Utah App.1990).

ond degree burglary, and felony theft. 701 P.2d at 18–19. Both husband and wife were tried together and convicted. *Id.* at 19. The Colorado Supreme Court reversed the convictions because "the great bulk of the evidence introduced at trial was directed toward [the husband's] alleged culpability," and thus "defense counsel could not properly refer to the disparate charges of criminal conduct or comment about this state of the evidence to the jury." *Id.* at 22.

The instant case is fundamentally distinguishable from *Armstrong.* All three Newman brothers were charged essentially with the same crimes. In addition, the disparity between what defendant and his codefendants were convicted of is not nearly so extreme as the disparities in charges and convictions present in *Armstrong.* Thus, the likelihood of a conflict, present in *Armstrong,* is not present here.

Furthermore, we find nothing suspect about choosing the common, unified defense that Wolfe was the aggressor at all times. *Cf. Holloway,* 435 U.S. at 482–83, 98 S.Ct. at 1178 ("'A common defense often gives strength against a common attack.'" (quoting *Glasser v. United States,* 315 U.S. 60, 92, 62 S.Ct. 457, 475, 86 L.Ed. 680 (1942) (Frankfurter, J., dissenting))). This strategy was consistently adhered to by all defense witnesses, including codefendant Don Newman. Even on appeal, defendant does not disparage this defense, but instead simply asserts that counsel failed adequately to de-emphasize his culpability. We find defendant's speculative, unsupported contentions in this regard to be without merit. *Cf. Webb,* 790 P.2d at 76 ("There is absolutely nothing in the record to suggest that counsel's choice of the united defense strategy, which Webb apparently supported enthusiastically until it produced an unfavorable verdict, was in any way prompted by a desire or effort to bolster [the codefendant's] defense at Webb's expense."); *see also Giles v. State,* 125 Idaho 921, 877 P.2d 365, 367 (1994), *cert. denied,* — U.S. —, 115 S.Ct. 942, 130 L.Ed.2d 886 (1995) ("Defendants consistently maintained that they had not committed the acts charged, and there was no evidence produced to show that they would have changed their defense strategies if they had had separate attorneys. Thus, [the code-

fendants] make no showing of an actual conflict of interest in the joint representation.").

■ Defendant's remaining conflict claims rest upon pure conjecture. For instance, defendant suggests that absent a conflict of interest, trial counsel would have referred to defendant more frequently in opening and closing statements. We fail to see, however, how this alleged shortcoming on counsel's part compels a conclusion that a conflict of interest existed.

■ Similarly, defendant theorizes that trial counsel somehow infringed his right to testify. Despite this bare assertion, defendant cites no record evidence that suggests he wished to testify, but was actively prevented from doing so. Absent any other information, the mere fact that defendant did not testify, even after counsel initially indicated to the jury that he would, does not necessarily mean counsel silenced defendant because of a conflict of interest. On the contrary, the decision that defendant not testify could have been made for any number of legitimate tactical reasons.

Moreover, defendant offers no details about what his testimony would have been. Instead, he relies on this court's decision in *State v. Johnson,* 823 P.2d 484 (Utah App. 1991), and suggests a conflict is manifest whenever a codefendant is not called to testify. However, *Johnson* involved a clear conflict between defense counsel and the defendant, where counsel was implicated in the same dealings for which the defendant was being tried. *Id.* at 486–87. In that limited circumstance, this court found that counsel's failure to call defendant to testify was a factor demonstrating counsel's conflict with his client. *Id.* at 490. Conversely, there is no special reason in this case to assume that defendant's failure to testify was a result of a conflict, as opposed to some other valid consideration. Thus, the mere fact that defendant did not testify does not establish a conflict in this case.

Because trial counsel told the court he would investigate any possible conflicts among the Newman brothers, the court was not obliged to further explore the matter. Moreover, defendant's speculation about how trial counsel might have performed differently and why defendant did not testify does not

establish that counsel labored under an actual conflict which affected his performance. Therefore, defendant's claim that a conflict of interest denied him the effective assistance of counsel fails.

### Potential Juror's Comment

 Defendant claims that his trial counsel ineffectively responded to prospective juror Cryer's statements that he had previously been assaulted by someone whose last name was Newman and who resembled the Newman brothers. Although the trial court struck Cryer for cause, defendant argues that Cryer's statement prejudiced the entire jury panel to the extent that any reasonably prudent attorney would have asked for a mistrial or curative instruction.

 To succeed on this ineffectiveness claim, defendant must demonstrate both that counsel's performance fell below an objective standard of reasonableness and that such unreasonable performance was prejudicial. *E.g., State v. Hovater,* 914 P.2d 37, 39 (Utah 1996); *Webb,* 790 P.2d at 72. To establish inadequate performance, defendant must overcome a strong presumption that legitimate tactical considerations and strategies motivated counsel's actions at trial. *E.g., State v. Tennyson,* 850 P.2d 461, 465 (Utah App.1993) (citing *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984)). To show prejudice, defendant must demonstrate that "but for ... counsel's deficient performance, there is a reasonable probability that the outcome of the trial would have been different." *Hovater,* 914 P.2d at 39 (citing *Strickland,* 466 U.S. at 688, 694, 104 S.Ct. at 2064–65, 2068); *accord State v. Templin,* 805 P.2d 182, 186–87 (Utah 1990).

In arguing that counsel's failure to request a mistrial or other curative instructions prejudiced his jury, defendant relies on *State v. Ferguson,* 228 Kan. 522, 618 P.2d 1186 (1980). In *Ferguson,* a potential juror indicated, during voir dire and in front of the other panelists, that the State had chosen a good prosecutor for the case and that the State would not have pressed charges unless substantial evidence had been collected. *Id.* 618 P.2d at 1193. The panelist was stricken for cause. *Id.* Subsequently, the trial court denied the defense's motion for mistrial, but admonished the remaining panelists to disregard the dismissed panel member's remarks and examined the panelists individually to ensure they could remain impartial. *Id.* The Kansas Supreme Court upheld the verdict, emphasizing both the trial court's curative precautions and the notion that a potential juror indicating bias is generally not grounds for dismissing the entire panel. *Id.*

Defendant posits that the *Ferguson* court would not have affirmed, absent the trial court's remedial precautions, and that such remedial precautions or a mistrial were necessary in his trial, but not requested by his trial counsel. However, the potential for prejudice in *Ferguson*—the inference that the prospective juror knew the prosecutor personally and was vouching for her credibility—was far more serious than any potential for prejudice here. In this case, the most any panelist could have taken from Cryer's comments was that he had been in a fight with some relative of the Newmans, in a situation wholly unrelated to the case at hand. *Cf. Reynolds v. State,* 686 S.W.2d 264, 267–68 (Tex.App.1985) (finding jury panel not prejudiced where "any inference which may have been derived from [the potential juror's] statement of an incident foreign to [defendant's] case was oblique" and assuming jury followed trial court's standard presumption of innocence and reasonable doubt instructions). Moreover, Cryer himself conceded that "the defendants can't really be responsible for their relatives' actions." Thus, the greater potential for prejudice in *Ferguson* warranted stronger precautionary measures than were warranted in the instant case.

Considering the isolated and innocuous nature of Cryer's comments, it was unnecessary for the trial court to question each panel member about bias, and there was no basis for a mistrial. We must presume then that counsel chose, for tactical reasons, not to emphasize the comments further by requesting a mistrial or special instructions. *Cf. State v. Wight,* 765 P.2d 12, 15 (Utah App. 1988) (finding defense counsel's decision to proceed with murder trial "a legitimate tactical judgement" where after trial began, juror stated she knew the victim's wife); *see also Boggess v. State,* 655 P.2d 654, 656 (Utah 1982). Furthermore, because any additional action was unnecessary, counsel's failure to

request such action could not have prejudiced defendant. Therefore, defendant's second claim of error fails.

## CONCLUSION

In this case, the trial court properly relied on counsel's representations that he would investigate the possibility of a conflict of interest among the Newman brothers. The trial court thus had no duty to delve further into the matter. Moreover, defendant has failed to show that counsel labored under an actual conflict of interest which adversely affected his performance. Finally, counsel's failure to draw undue attention to a prospective juror's extraneous comments did not constitute constitutionally ineffective assistance of counsel. Thus, defendant has not demonstrated that he was denied the effective assistance of counsel. We therefore affirm his conviction.

BENCH and WILKINS, JJ., concur.